SVITOJUS *v.* KURANT.

JUDGMENT—RES JUDICATA—FEDERAL COURT—DIVERSITY OF CITIZEN-
SHIP—FRAUD—CONSPIRACY.

> Decree of Federal court dismissing bill by alien heirs at law
> for accounting by guardian of an incompetent person's estate,
> surety on his bond, and administrator of the estate, because of
> plaintiffs' failure to establish fraud and conspiracy alleged
> and therefore such court was without jurisdiction to grant re-
> lief, was *res judicata* of same issues between same parties under
> substantially the same record in the State court, notwithstand-
> ing provision in Federal decree relative to jurisdiction.

CHANDLER and MCALLISTER, JJ., dissenting.

Appeal from Kent; Moll (Lester S.), J., presiding.
Submitted June 14, 1939. (Docket No. 91, Calendar
No. 40,615.) Decided June 3, 1940. Rehearing de-
nied September 6, 1940.

Amended bill by Juozas Svitojus and Zuzana
Svitojus against Joseph Kurant, guardian of the
estate of Joseph Svitojus, mentally incompetent,
Frank D. McKay, and John J. Smolenski, adminis-
trator of the estate of Joseph Svitojus, deceased, to
set aside certain probate court orders, for an ac-
counting and other relief. Bill dismissed. Plain-
tiffs appeal. Affirmed.

*Olis, Vasalle & Lapinskas* and *Fred P. Geib* (*Leo
W. Walsh* and *Clem H. Block,* of counsel), for plain-
tiffs.

*McDonald & McDonald,* for defendants Kurant and
McKay.

*John M. Dunham,* for defendant Smolenski.

NORTH, J. For the reasons hereinafter stated, the circuit judge's decree dismissing plaintiffs' bill of complaint should be affirmed. A question of first importance is; whether the decree entered in the Federal court for the western district of Michigan should be held to be *res judicata* of the present suit. Plaintiffs are residents and citizens of the Republic of Lithuania, and defendants are residents of this State. Obviously plaintiffs planted their former suit in the Federal court because of diversity of citizenship. The record on this appeal clearly discloses that the parties litigant in the instant case are the same as in the Federal case and the subject matter is the same. In both suits plaintiffs charged defendants with the same fraud and misconduct, and the same testimony was presented and relied upon in the two cases. After a full hearing on the merits the judge of the Federal court found plaintiffs had failed "to establish by a fair preponderance of the evidence the charges of fraud and conspiracy" and in consequence thereof he held the Federal court was without power or jurisdiction to grant relief. A decree was entered dismissing plaintiffs' bill of complaint.

It may be conceded that dismissal in the Federal court, if on the sole ground of lack of jurisdiction of the parties or of the subject matter, would not bar a subsequent hearing and determination of the same suit in a court of competent jurisdiction. *Hughes* v. *United States,* 4 Wall. (71 U. S.) 232. But a fair reading of this record discloses beyond all question that, after hearing the same testimony that the circuit judge in the instant case heard (with the exception of some inconsequential exhibits introduced by defendants), the Federal district judge found against the plaintiffs because they had failed to establish the fraud or misconduct on the part of any of the defendants that plaintiffs had charged in their bill of complaint. Surely this was a holding on the

merits of that case, and plaintiffs are now in the State courts asking a second adjudication of the identical issues between the same parties; and, strange as it may seem, on the same testimony as taken in the Federal court. The district judge, notwithstanding he stated a lack of jurisdiction, made it plain that he was brought to his conclusion because plaintiffs had failed to prove the alleged fraud or misconduct on which they asserted their right to relief. Nowhere in his opinion did the Federal district judge question the obvious fact that he did have jurisdiction of the parties and of the subject matter in this suit; but he did hold that he could not grant relief because plaintiffs had failed to prove the alleged fraud or misconduct. In this particular we quote from his opinion:

"Plaintiffs have failed to establish by a fair preponderance of the evidence the charges of fraud and conspiracy enumerated in the last preceding paragraph of these findings, and *with these issues eliminated no jurisdiction remains in this court* to determine issues relative to lack of prudence in making investments or to the settlement of the accounts of the guardian or administrator, or as to the liability of the surety upon the bond of the guardian.

"The sole jurisdiction over *these remaining issues* is vested in the probate court for the county of Kent."

From the above it convincingly appears that Judge Raymond, before whom the case was tried in the Federal court, specifically passed upon the merits of plaintiffs' case insofar as the bill charged fraud or conspiracy on the part of defendants; but he declined to pass upon the matters specifically indicated in his opinion, to-wit: (1) The propriety of investments made with funds of the Svitojus estate; (2) the settlement of the accounts of the guardian or administrator; (3) the liability of the surety upon the

guardian's bond. As to each of these three issues
the Federal judge held that "sole jurisdiction" was
in the probate court of Kent county, wherein the
matter of the Svitojus estate was still pending.

In disposing of a motion to dismiss in the Federal
court, Judge Raymond in his opinion said:

"The court, *after a careful review of the record,* is
of the opinion that these charges (of fraud or con-
spiracy) have not been sufficiently sustained to war-
rant the relief prayed. *This finding* compels dismis-
sal of the bill of complaint for want of jurisdic-
tion. * * *

"It is probably true that had the proofs estab-
lished conspiracy or fraudulent misappropriation
with consequent wastage of the assets of the guard-
ianship and decedent estates, this court would be
warranted in assuming jurisdiction, but no case is
cited by plaintiffs and none is revealed by diligent
search which warrants the assumption of such juris-
diction for determination *of the other issues here in-
volved.* * * *

"An order may be entered dismissing the bill of
complaint for want of jurisdiction, *but without prej-
udice to further proceedings upon similar issues in
the probate court of Kent county.*"

In none of the cases cited in my Brother's opinion
does it appear, as in the instant case, that the court's
dismissal on a holding of lack of jurisdiction was
based upon the plaintiff's failure to prove alleged
facts essential to recovery on the merits. Even in
*Weigley* v. *Coffman,* 144 Pa. 489 (22 Atl. 919, 27 Am.
St. Rep. 667), cited and quoted in Mr. Justice Chan-
dler's opinion, it appears that dismissal for want of
jurisdiction was on demurrer, not after a hearing
on the merits. The following is from the syllabus in
that case:

"When a bill has been dismissed upon the ground
that the court had no jurisdiction, *showing that the*

*merits were not heard,* the dismissal is not a bar to a second bill."

From the record before us it appears the holding of the Federal district judge was that plaintiffs, who sought relief on the ground of alleged fraud and conspiracy, had failed to prove their case on its merits; and on its merits the Federal judge decided these issues against plaintiffs. Such decision clearly constitutes *res judicata* of the same issues presented by the same parties in the instant case. In short, the holding of the Federal district judge was this: Since plaintiffs sought relief on the ground of fraud or misconduct which they did not prove, they had failed on the merits; and insofar as they sought relief on other grounds above enumerated, their sole remedy was to institute proceedings in the Kent county probate court, because as to such matters the Federal court was without jurisdiction after plaintiffs had failed to establish alleged fraud or conspiracy. To this end the Federal court's decree dismissing the bill of complaint specifically provided it was without prejudice *only* as "to further proceedings upon similar issues in the probate court of Kent county." As to plaintiffs' allegations of fraud, conspiracy and misconduct in the Federal court case, the decree of the Federal judge was *final,* and not "without prejudice;" but the right of plaintiffs to litigate in the Kent county probate court the other issues specified was reserved. To this extent only the Federal court's decree was without prejudice. In this connection it should be noted that proceedings in the Joseph Svitojus estate in the Kent county probate court were pending while plaintiffs' Federal court suit was being tried; and that such proceedings were still pending in the probate court when the instant case was appealed to this court. Evidently with this in mind the circuit judge, in decreeing dismissal

of plaintiffs' bill of complaint in the instant case, also provided that such dismissal was "without prejudice to any further proceedings in the probate court of Kent county."

Under this record the Federal district judge clearly passed upon the merits of plaintiffs' claim that defendants were guilty of fraudulent misconduct and dismissed plaintiffs' charges so made as not proven. When thereafter in the instant case the same plaintiffs made the same charges against the same defendants and relied on the same testimony, it necessitated the holding of the circuit judge that such charges had already been adjudicated. His decree dismissing the bill of complaint without prejudice to plaintiffs' right to institute further proceedings in the probate court of Kent county, not involving the alleged fraudulent misconduct or conspiracy adjudicated in the Federal court, should be affirmed.

Appellees also urge other grounds for affirmance which we think must be given consideration. They stress another phase of *res judicata* and also laches on the part of plaintiffs.

As to appellees' further claim of *res judicata,* the record discloses that defendant Joseph Kurant submitted his first guardian's account in 1926; and he therein plainly disclosed to the probate court that of the $14,056.85 which constituted the estate in the guardian's hands and which had come to him in cash, $13,204.88 had been invested by him in land contracts. In part the guardian's annual account reads:

> "Money invested in land contracts     $13,204.88
> Money in savings account                    204.92
>                                          $13,409.80"

The balance of the estate ($647.05) was accounted for by expense items incurred during the year. This

annual account was regularly submitted to the probate court and allowed, April 26, 1926, by Probate Judge Clark E. Higbee, who was not related to the surety on the guardian's bond. There was no appeal taken from this order. The hearing and approval of this first annual account was *res judicata* of any claim that the guardian's prior "land contract" investments had been improperly or fraudulently made. The exception to the foregoing statement is that the order of allowance would be assailable if obtained by means of fraudulent misrepresentation or fraudulent concealment, but of this there is no proof; and a further bar to such a contention will be noted in considering appellees' claim as to laches. Concerning the finality of a probate court's allowance of a guardian's account from which no appeal is taken, we have said:

"A guardian's accounting is an equitable and not a legal proceeding. It involves not merely the ordinary items of debit and credit, but also considerations as to the propriety of charges and investments and as to the allowance of compensation." *Gott* v. *Culp,* 45 Mich. 265, 275.

In *Re Horn's Estate,* 285 Mich. 145, 151, Justice CHANDLER, speaking for the Court, said:

"The requirement of an annual account is not deemed an idle ceremony, but an order of the probate court allowing an annual account which is not appealed from is held to be conclusive. The rule is clearly stated in *Nowland* v. *Rice's Estate,* 138 Mich. 146, in these words: 'The order of the probate court allowing the first account being unappealed from, is conclusive upon appellant. If he desired to dispute any of the findings of the court upon the items of that account, he should then have appealed. He cannot reopen it 12 years after it has been adjudicated, upon the assumption that it was erroneous.

Parties interested in the estate had a right to assume that the account as allowed was correct, and to rely upon the order of the court as final.' ''

To the same effect, see, also, *In re Chittick's Estate,* 286 Mich. 124.

The agreed statement of facts embodied in this record contains the following: ''The sales material to the issue (*i.e.,* wrongful investment of guardianship funds) are evidenced in two deeds as follows;'' and here are set forth in the record three investments of guardianship funds, one of which is the investment in the so-called ''Buffin property.'' This is the investment on which a substantial loss was sustained approximately 10 years after the guardian made the investment by reason of a compromise settlement authorized by Probate Judge Dalton, September 10, 1935; and this order authorizing the compromise is one of the orders strenuously assailed by appellants on the ground the probate judge was Mr. McKay's brother-in-law, appellants asserting the order for that reason was void. But on all controverted matters pertaining to the guardian's investment in the so-called ''Buffin property'' appellants are confronted with the undisputed record that this investment was approved by Probate Judge Higbee on April 26, 1926, when he entered the order allowing the guardian's first annual account. Plaintiffs have offered no testimony tending to establish that in securing the allowance of his first annual account defendant Joseph Kurant either by fraudulent misrepresentation or fraudulent concealment induced Judge Higbee to enter the order of allowance. Nor is there testimony that Probate Judge Higbee in making that order was misled or deceived by either of the other defendants to this suit. It follows that at least as to the guardian's investment in the so-

called "Buffin property," plaintiffs are barred of relief on the ground of *res judicata*.

And it might well be urged that the subsequent investments of like character and under like cir-. cumstances by the guardian were at least impliedly authorized by the allowance of the guardian's first annual account which disclosed to the court that already all of the guardianship funds, with the exception of $204.92 deposited in a savings account, had been invested in land contracts.

The record as to the allowance of the guardian's final account is, we think, likewise barren of testimony of fraudulent misrepresentation or fraudulent concealment chargeable to any of the defendants. We are mindful in this particular appellants urge that the guardian's petition, in consequence of which his final account was allowed and he and his surety were discharged, was so misleading and lacking in.details it sustains appellants' contention that the guardian was guilty of fraudulent misrepresentation or at least of fraudulent concealment through which the order was obtained; and that the administrator in giving a receipt of like character to the guardian for the assets of the estate and consenting to the guardian's discharge was a party to the fraudulent misconduct. Under the record this contention is not tenable; but instead the record conclusively shows that the probate judge at that time was advised in detail as to the investments into which the estate's funds had gone.

In this particular we note the following undisputed facts: The guardian filed his final account in the probate court October 1, 1930. While this account was allowed on the 7th day of November, 1930, he was not discharged until the 27th day of January, 1931. In the meantime and on January 20, 1931, the administrator receipted for the assets of the estate

and consented to the discharge of the guardian. But prior to the discharge of the guardian and his surety, and on January 22, 1931, the administrator filed with the probate court a detailed inventory of the assets of the Svitojus estate, which we now quote in detail:

"A true and perfect inventory of all goods, chattels, rights and credits of said estate, to-wit:

"This inventory dates as of October 1, 1930, at the time that Mr. Joseph Kurant, Guardian of Joseph Swetojus, mentally incompetent, filed his final account in the estate of the mentally incompetent Swetojus.

| | |
|---|---:|
| "Due from Joseph Bartkus on land contract, house and lot at 1332 Muskegon avenue, N. W. | $ 6,388.59 |
| "Due on land contract from Ernest Buffin house and lot at 156 Straight avenue, N. W. | 7,832.14 |
| "Due from Peter D. Hollander on land contract, house and lot at 2210 Genesee street, N. W. | 3,636.32 |
| "Total due on land contracts | 17,857.05 |
| "Cash on hand | 178.52 |
| "Cash by McKay check # 6578 | 32.47 |
| | $18,068.04" |

This inventory further disclosed that the property covered by the Hollander land contract was subject to a prior mortgage in the amount of $1,500; and that the property covered by the Bartkus land contract was subject to a prior mortgage of $2,819.23. Hence it conclusively appears from this record that the probate judge was in possession of this detailed inventory five days prior to the discharge of the guardian and his surety, and was not misled by any fraudulent misrepresentation or fraudulent concealment with which any of these defendants are chargeable. It follows that, except for the contention of appel-

lants that the probate judge's order was void because of his relationship to Mr. McKay, a final and conclusive adjudication was made of all issues involved in the final discharge of the guardian.

In this connection it should be noted that none of the investments of which appellants complain were made by the administrator. There is no showing that he was guilty of any misfeasance or malfeasance in the administration of his trust. Nor does the record sustain appellants' contention that the administrator was requested to institute proceedings by which alleged misappropriations by the guardian and his surety could be recovered for the estate and the administrator refused to do so. In fact the administrator was not even made a party defendant to this case until the plaintiffs filed their amended bill of complaint. Under this record plaintiffs did not establish a right to relief against defendant Smolenski. Even if it be assumed that the circuit judge was in error in dismissing the bill on the ground of *res judicata,* plaintiffs cannot complain as to denial of relief against Mr. Smolenski because they made no case against him. On this phase of the appeal it is worthy of note that in their brief appellants do not ask for any specific relief against defendant Smolenski. Perchance this is due to the fact that Mr. Smolenski's petition for the allowance of his final account as administrator is still pending in the probate court of Kent county. If so, it discloses another reason why Mr. Smolenski should not have been made a party defendant in plaintiffs' amended bill of complaint and sustains, as to this defendant, the circuit judge's decree dismissing the bill.

Another circumstance bearing somewhat upon this phase of the case is that subsequent to the dismissal of plaintiffs' bill of complaint in the Federal court they instituted further proceedings in the Kent

county probate court. The nature of these proceedings appears from the following allegation in plaintiffs' bill of complaint in the instant case:

"That plaintiffs herein have objected to the allowance of said account and are seeking to recover the losses sustained by their decedent, Joseph Svitojus, and by his estate, by reason of the unlawful and improper investments of his funds by defendants McKay and Kurant and by reason of the failure and refusal of said John J. Smolenski seasonably to require an accounting by said Kurant and by said McKay."

The proceeding thus instituted in the probate court is still pending, decision thereof having been held in abeyance by the probate judge until final disposition of the instant case.

As to all the defendants, it is urged that dismissal of plaintiffs' bill of complaint was proper on the ground of laches. In considering this question we will assume, but do not so hold, (1) that the guardian's investments of the estate's funds were of such a character that, had proper proceedings been timely instituted, he could have been surcharged with resultant losses; and (2) that the orders of Probate Judge Dalton, because of his relationship to defendant McKay, were void, or at least voidable.

The pertinent facts bearing upon appellees' claim of laches are hereinafter stated. Joseph Svitojus died August 21, 1930. Prior to his death plaintiffs had no interest in his estate, and hence they could not be held guilty of laches except subsequent to August 21, 1930. Plaintiffs' bill of complaint was filed May 27, 1938. In the main the basic relief sought is cancellation of three orders made by Probate Judge Dalton. These three are: (1) the order of November 7, 1930, allowing the guardian's final account; (2) the order of January 27, 1931, discharging the guard-

ian and his surety; and (3) the order of September 10, 1935, authorizing and directing a compromise in settlement of the amount due the estate on the Buffin land contract.

Since plaintiffs' claim for relief on the ground of fraudulent misconduct is, as we have above held, barred by the defense of *res judicata,* this phase of the record may be disregarded in considering the question of laches. Passing for the moment appellees' contention that if the noted probate court orders are void because of the relationship of the probate judge to Mr. McKay, then the questions arising are open to adjudication in the probate court; and giving consideration to appellants' claim that they did not know of this relationship until after time to appeal from the order of September 10, 1935, had expired, the following observations are pertinent. The burden of excusing seeming laches was on plaintiffs. 35 C. J. p. 237 and cases cited. While plaintiffs allege this lack of knowledge in their amended bill of complaint, the allegation was neither admitted nor denied, but plaintiffs were left to their proof. We find no proof nor admission in the record which sustains plaintiffs' alleged lack of knowledge. In this particular they have not excused delay in instituting suit.

Thus the only issues left open for possible adjudication are those excepted from Judge Raymond's decree, to-wit: (1) the propriety or legality of investments made with the Svitojus estate's funds; and (2) the validity and finality of the orders allowing the guardian's final account, and discharging him and his surety. While Judge Raymond held that the probate court had "sole jurisdiction over these remaining issues," and notwithstanding plaintiffs prior to this suit had instituted such proceedings in the probate court, they have seen fit also to seek adjudi-

cation of these issues in the instant suit in equity. Consideration of the defense of laches is material only as it pertains to these issues reserved in Judge Raymond's order of dismissal.

Incident to the defense of laches, appellees stress these facts. Immediately after Svitojus' death, plaintiffs, being residents of Lithuania, were represented by that country's consul located in Chicago. He made inquiries of defendant Smolenski in the latter's capacity as a public administrator even before he was appointed administrator of the Svitojus estate. As soon as the assets of this estate were delivered to the administrator shortly following his appointment, he mailed, on January 22, 1931, to the consul a copy of the detailed inventory of the estate's property which is above set forth. At that time there were no serious defaults in payments on the contracts held by the estate, nor were there any other circumstances at that time which should have caused the administrator to be apprehensive of holding these contracts as assets of the estate. He testified concerning the balance then unpaid on these contracts: "It was cash so far as I was concerned." Very soon after the administrator was appointed, the Lithuanian consul and his secretary came to Grand Rapids and investigated in detail. Thereafter the consul or his agents came repeatedly to Grand Rapids and acquainted themselves with the affairs of the estate. Further, following his appointment as administrator, defendant Smolenski carried on a somewhat continuous correspondence with the consul's Chicago office. In this connection it should be noted that no claim is made by plaintiffs of deceit or fraudulent concealment on the part of the administrator, save one unjustifiable claim of such nature pertaining to a letter written to the consul prior to the time defendant Smolenski was appointed admin-

istrator, and in which letter there appears what is obviously an inadvertent misstatement of fact. At all times following his appointment, plaintiffs' representatives had the full cooperation of the administrator. A brother of the deceased, Tony Smedt, who lived in Chicago and who appears to have been in frequent contact with the Lithuanian consul concerning this estate, also seemingly had full information about the estate's affairs. He became actively interested in an attempt to close the estate; and early in 1932 this brother negotiated for a purchase of the assets of the estate for something like $8,000, but this transaction failed of consummation because of Smedt's inability to secure the necessary funds.

On January 14, 1933, the administrator mailed a copy of his final account filed in the probate court on that date to the consul in Chicago. This again gave plaintiffs' representatives detailed information of the assets and condition of the estate. This account was allowed, but the administrator was not discharged because one of plaintiffs' representatives requested the administrator to continue to look after the estate. Later, and on May 1, 1936, another final account was filed by the administrator. Hearing on the allowance of this account and discharge of the administrator was deferred at the request of one of plaintiffs' present counsel, and the hearing is still pending in the probate court.

On August 2, 1935, a petition was brought on for hearing in the probate court by which directions from the court were sought as to the advisability of salvaging something from the Buffin contract by means of a Home Owners Loan Corporation loan. The Lithuanian consul and the Chicago attorney were present at this hearing; and it appears from the record that they neither seriously objected to, nor did they consent to, this compromise of the amount

due on the Buffin contract. The probate court thereupon made an order authorizing and directing the compromise whereby the estate received Home Owners Loan Corporation bonds in the approximate amount of $3,000; but this resulted in a loss to the estate of substantially $7,000 on the Buffin contract investment. It was at this hearing that plaintiffs' representatives for the first time made an objection in the presence of the administrator to the probate court to the investments made in the land contracts long before this by the guardian, and raised the question as to the responsibility for financial loss which was then apparent. It was on this occasion that counsel representing plaintiffs suggested to the probate court the propriety of the administrator instituting proceedings against Kurant and McKay; but this suggestion was overruled by the probate judge on the ground that the only matter then before the court was the question of authorizing a compromise in settlement of the Buffin contract.

From this record it may fairly be said that during the years following Svitojus' death plaintiffs' representatives had full access to and knowledge of all the records and proceedings pertaining to the estate. The administrator had possession of the papers which disclosed all the transactions between the guardian and Mr. McKay, and no claim is made that the administrator deprived plaintiffs' representatives of access to these papers. In fact, since the death of Svitojus in 1930, and long prior thereto, the deeds by which Mr. McKay had conveyed the lands covered by the contracts to the guardian, and which specifically recited the prior mortgage liens, were on record in the office of the register of deeds for Kent county. And during the above period on two occasions the administrator upon request had made remittances from the funds of this estate in the total amount of

$500 to the Lithuanian consul for the benefit of plaintiffs. While the statute which limits the bringing of an action on the bond of the surety of an executor, administrator or guardian to four years after their discharge (3 Comp. Laws 1929, § 13976, as amended by Act No. 21, Pub. Acts 1937 [Stat. Ann. 1939 Cum. Supp. § 27.605]) is not pleaded, nonetheless this statutory provision has a material bearing upon the defense of laches asserted by appellees.

As hereinbefore noted, this suit was not instituted by plaintiffs until May, 1938. In the meantime, and subsequent to full knowledge on the part of plaintiffs' representatives of the character of the investments which they now assail, the general depression and the bank holiday of 1933 had rendered many investments of the character here involved extremely hazardous, if not worthless. Two of the estate's contracts were totally lost by the foreclosure of prior mortgage liens. We do not hold that investments of the character of which plaintiffs herein complain may not be challenged, if action is timely taken. But it was not until after this estate had suffered serious losses incident to the general depression and some of its assets had been completely wiped out that plaintiffs seem to have conceived the idea of taking action by which the estate's losses could be shifted to the guardian and his surety, who had been discharged in 1931, and to the administrator who has not yet been discharged and whose doings relative to this estate are subject to the sole jurisdiction of the Kent county probate court. In view of the facts above detailed and other facts appearing in the record which have a bearing upon the knowledge plaintiffs' representatives possessed long before this suit was started, most of it since shortly after the death of Svitojus in 1930, we conclude that, as contended by appellees, plaintiffs cannot recover because of laches.

In my Brother's opinion for reversal some statements are made and inferences drawn which to me seem not to be justified by the record. In fairness it should be noted again that at the time the administrator gave his receipt to the guardian for "Thirteen Thousand Seven Hundred Thirty-eight and 81/100 dollars, in full balance of said estate" the guardian and his bondsman had not yet been discharged; and that prior to their discharge on January 27, 1931, the administrator filed with the probate court his inventory showing that the assets of the estate consisted of the vendee's interest in three land contracts; that two of them were subject to prior mortgage liens; and the third contract investment (the Buffin contract) was one that had been approved several years before by Judge Higbee. At the time the receipt was given there was no material default in contract payments, and the administrator, as he testified, considered "it was cash so far as I was concerned." It surely requires a stretch of imagination to conclude that with this full record before him the probate judge was deceived or misled when he made the order discharging the guardian and his bondsman and that defendant Smolenski was a party to a fraud thus perpetrated on the probate judge.

It is stated by Justice CHANDLER: "The status of the plaintiffs was not the same" in the Federal court as in the instant case. Conclusively they are now asserting the same claims and against the same persons as in the Federal court; and plaintiffs' rights are not greater nor on a different or sounder legal basis merely because the probate court in the meantime made an order assigning to them certain alleged assets of the estate. Contrary to my Brother's inference to that effect, these plaintiffs did not fail of relief in the Federal court on the ground that they

were not proper parties plaintiff. Nor could it have been so held. Plaintiffs were the sole heirs at law of the Svitojus estate. As such they brought their Federal suit against all three of these defendants. In the Federal court plaintiffs charged Kurant and McKay with the same misconduct charged in the instant case; and also charged that: ''The said Smolenski has conspired with said other defendants to prevent said losses from being recovered.'' Certainly in a suit so framed these plaintiffs, as sole heirs at law of the intestate Svitojus estate, were the proper and necessary parties plaintiff in the Federal court. *Buchanan* v. *Buchanan,* 75 N. J. Eq. 274 (71 Atl. 745, 138 Am. St. Rep. 563, 20 Ann. Cas. 91), and 22 L. R. A. [N. S.] 454, where an exhaustive note cites numerous authorities in accord with the *Buchanan Case.* In the latter case the syllabus reads:

''The exception to this rule (that a suit must be brought by the personal representative) arises where the personal representative of the deceased, by reason of collusion with the defendant or otherwise, is derelict in the performance of his duty, when, as in the case of a delinquent trustee, the next of kin, like the *cestui que trust,* may maintain the action, joining the administrator as a party defendant.''

I cannot subscribe to my Brother's holding ''that no one other than the administrator could take any proceedings for an accounting or recovery'' in the case in the Federal court; or that prior to the probate judge's order of assignment ''these plaintiffs had no legal status in any court either Federal or State.'' The cases cited by my Brother are not applicable where, as in the Federal case, the administrator was made a party defendant with others jointly charged with fraud, conspiracy, et cetera. In any event, plaintiffs, by having brought their suit in the Federal court and having gone to a final hearing on the

merits, are estopped from now asserting they were not proper parties plaintiff; and they do not make such claim in their brief filed herein.

While it is true, as stated by Justice CHANDLER, that: "The record in this case does not contain a copy of the Federal pleadings," nonetheless sufficient of plaintiffs' bill of complaint filed in the Federal court does appear in this record to show beyond cavil that the material claims of plaintiffs were the same in the Federal court as in this court; and after a full hearing on the merits the Federal judge, as above noted, held:

"Plaintiffs have failed to establish by a fair preponderance of the evidence the charges of fraud and conspiracy enumerated * * * and with these issues eliminated no jurisdiction remains in this court."

With such a record before us on this appeal it cannot be said that the suit in the Federal court was dismissed without passing upon the merits and solely for want of jurisdiction. The Federal judge very definitely stated that the reason he denied plaintiffs relief was because they failed to establish the fraud and misconduct alleged in their bill of complaint.

The main theory upon which plaintiffs assert a claim of liability against defendant Smolenski is that he has been guilty of nonfeasance in not having brought suit against the other defendants to recover for alleged wrongful investments of the estate's funds. As noted above, Smolenski was not even made a party defendant in the original bill filed in this case, no specific relief against him is prayed in the amended bill or asked in appellants' brief in their statement of the relief sought. He is still acting as administrator of the Svitojus estate now pending in the probate court of Kent county. He is answerable to that court if guilty of nonfeasance or misfeasance.

All the land contract investments of which plaintiffs now complain were made several years before Smolenski as administrator received from the guardian these contracts as assets of the Svitojus estate in 1931. It clearly appears that notwithstanding plaintiffs and their representatives had been fully advised since 1931 of the character of these investments, no demand was made that Smolenski should start suit against Kurant and McKay. As noted above, on one occasion plaintiffs' counsel in probate court suggested the propriety of such an action, but the probate judge declined to accept the suggestion, and plaintiffs' counsel accepted the court's ruling. Surely under such circumstances it would have been presumptuous for the administrator of his own motion to have assailed the three investments of which plaintiffs now complain. As to two of these land contract investments, the probate judge, with full knowledge of the prior mortgages, had accepted the guardian's final account and discharged him and his surety. As to the remaining land contract (the Buffin contract), the probate records and files disclosed that on hearing Probate Judge Higbee had approved this investment in April, 1926, over 12 years before plaintiffs filed the bill of complaint in the instant case. It is also pertinent to observe that if plaintiffs or their counsel desired such a suit started their duty was so to demand of the administrator, and if he refused to act the plaintiffs might then have brought the suit in their own behalf. 21 Am. Jur. p. 940 and numerous cases cited in note 22 L. R. A. (N. S.) 454, 458. While not squarely to the point under consideration, but as being somewhat in this field of the law, see, also, *Foote* v. *Foote,* 61 Mich. 181; *Letts* v. *Letts,* 73 Mich. 138; *Snyder* v. *Snyder,* 131 Mich. 658.

Under such circumstances plaintiff cannot now charge Smolenski with nonfeasance in consequence

of his not having instituted suit against Kurant and McKay. Nor can plaintiffs in this manner escape the bar of their own laches. That plaintiffs' laches have worked a prejudice to the defendants is evidenced by the fact that in 1932 a brother of the deceased was negotiating the purchase of the estate's assets at approximately $8,000; but subsequently these assets materially shrunk in value and in part became a total loss.

It cannot be assumed that plaintiffs or their representatives did not know these land contract investments were made by the guardian until ''some time in July, 1935,'' the date fixed by Justice CHANDLER; nor that Smolenski suppressed the facts. As to two of the contracts, conclusively plaintiffs' representatives knew of the prior mortgage liens when Smolenski filed his inventory, January 22, 1931. He mailed a copy of this inventory to plaintiffs' representative. It must have been known by all concerned that the investments were made by the guardian because they were dated subsequent to his appointment. Further, it was a known fact that nearly $12,000 of Svitojus' money was in Chicago banks when the guardian was appointed. Surely it would tax one's credulity to conclude, with all the continued activities of plaintiffs' representatives following Svitojus' death in 1930, including his brother's effort to purchase the estate's assets in 1932, that the details of each of these land contract investments were not known to all concerned; especially since the conveyances were on public record in Kent county and had been for a number of years.

Plaintiffs have been fully advised of all the material facts now before the court since shortly after the death of Joseph Svitojus on August 21, 1930. If they have a right of action now, they had one then. They did not begin this suit until May, 1938. The

guardian and his bondsman were discharged in January, 1931. Dismissal of plaintiffs' bill of complaint was fully justified both on the ground of *res judicata* and because of laches.

The decree entered in the circuit court is affirmed, with costs to appellees.

Bushnell, C. J., and Wiest and Butzel, JJ., concurred with North, J.

Potter, J. (*concurring*). The principal controversy in this case arises over what is jurisdiction.

Jurisdiction "is generally defined as the authority or power which a man has to do justice in causes of complaint brought before him; the power and authority to declare the law * * * the right to apply the law to acts of persons. Jurisdiction always emanates directly and immediately from the law; it is a power which nobody upon whom the law has not conferred it can exercise." 35 C. J. p. 426, and cases cited.

The jurisdiction of a court, its right to speak, is the right, or rather its power, to pronounce a particular, final judgment or decree as to a particular person in a particular action. *In re Hall,* 94 N. J. Eq. 108 (118 Atl. 347).

The United States district court, upon the question of diversity of citizenship, exercised the power and authority to investigate this case and to find fraud and conspiracy if any existed. That was the basis of its jurisdiction—of its right to act at all in the cause brought before it by plaintiffs' bill. The court said:

"Plaintiffs have failed to establish by a fair preponderance of the evidence the charges of fraud and conspiracy enumerated in the last preceding paragraph of the findings and with these issues eliminated no jurisdiction remains in this court to determine is-

sues relative to lack of prudence in making investments or to the settlement of the accounts of the guardian or the administrator, or as to the liability of the surety upon the bond of the guardian.''

In the Federal court, the plaintiffs were the same parties as are here involved. The defendants were the same parties. The charges of fraud and conspiracy were the same as are relied upon in this case. The same record is now relied upon in this court as was relied upon by the United States district court. There is identity of parties plaintiff, identity of parties defendant, identity of charges of fraud and conspiracy. That court having there litigated the question of fraud and conspiracy and having dismissed the bill of complaint because such charges were not established (that being the only ground on which the court could take jurisdiction), such decree is a former adjudication of the cause of action here involved.

''A former adjudication of the right of action, where the court had jurisdiction of the subject matter and of the parties, is unquestionably a bar to an action for the same debt or claim, and is conclusive where the same subject matter is sought to be again litigated, no matter how, between the same parties.'' *Bond* v. *Markstrum,* 102 Mich. 11.

We think this conclusive. Decree is affirmed, with costs.

SHARPE, J., concurred with POTTER, J.

CHANDLER, J. (*dissenting*). Plaintiffs, residents of the Republic of Lithuania, being father and mother and sole heirs at law of Joseph Svitojus, deceased, filed their amended bill of complaint herein, wherein it is alleged that prior to decedent's death and on or about January 16, 1925, the latter had been adjudi-

cated to be a mentally incompetent person; that at the time of such adjudication, deceased was possessed of assets in the approximate sum of $14,000, consisting of cash on deposit in various banks; and that defendant Kurant, guardian of the incompetent's estate, furnished bond in the sum of $10,000 with defendant McKay as surety thereon.

The bill further alleges that the said guardian was unversed in business affairs and that he was acting as a dummy for defendant McKay, to whom he delivered the assets entrusted to him as guardian; that the said McKay invested the assets so received by him in land contracts covering real estate incumbered by mortgages; that thereupon McKay conveyed said real estate, and assigned said land contracts, so incumbered, to Kurant as guardian, the deeds of conveyance binding the estate of the incompetent to assume and pay the mortgages incumbering the property conveyed. It is alleged that the transactions mentioned were never approved by the probate court; and that upon the death of the incompetent, McKay caused to be presented to said court what purported to be a final account of the guardian; and that said purported final account was false and fraudulent in that it failed to show the nature of the investments which had been made.

Continuing, the bill alleges that defendant Smolenski was appointed as administrator of the estate of the deceased incompetent; that he thereupon delivered to Kurant, as guardian, a receipt which was false and fraudulent in that it purported to show that the said administrator had received assets of the estate consisting of cash in the sum of $13,738.81, whereas in fact the assets had been invested in McKay's incumbered real estate as heretofore mentioned; and that the final account of the guardian was allowed by John Dalton, probate judge, a brother-in-

law of defendant McKay, and an order entered discharging the guardian from his trust, which was followed by an order cancelling the bond of McKay. The receipt given by administrator Smolenski follows:

"Grand Rapids, Mich. January 20, 1931

Received of—Joseph Kurant—guardian of the estate of J. Switojus, alias Switai, mentally incompetent, Thirteen Thousand Seven Hundred Thirty-eight & 81/100 Dollars, in full balance of said estate, and in full settlement of all claims against said guardian, and I hereby consent to his discharge as such guardian.
$13,738.81

(signed) JOHN J. SMOLENSKI,
Administrator."

It is also alleged that on September 11, 1935, defendant Smolenski, as administrator, obtained an order, over plaintiffs' objections, from the same probate judge, compromising at a loss to the estate a claim against certain vendees named in one of the land contracts theretofore assigned to the guardian by defendant McKay, said contract being referred to as the Buffin contract.

It is finally charged that no proceedings were had in the probate court on behalf of the administrator, Smolenski, to set aside the orders discharging the guardian and cancelling the bond of McKay for the reason that the administrator was under obligation to the said McKay and acted as his attorney in various matters; that the said orders are null and void because based upon a fraudulent concealment of facts and because the said probate judge, being a brother-in-law of McKay, was disqualified to act in the premises; and that

"The estate of said deceased insane, Joseph Svitojus, has suffered great and unnecessary losses by

reason of the unlawful and improper investments of the funds of said estate by the said guardian, Kurant, and by his bondsman McKay; that said defendants have never accounted for said losses and that defendant McKay profited by such investments in that he unloaded upon the estate of the insane person, Joseph Svitojus, at prices far above the then market, divers and sundry parcels of incumbered real estate then and there owned by the said McKay; and plaintiffs aver that in equity and good conscience the said McKay should restore to said estate and should be required to indemnify said estate against the losses so caused."

The prayer for relief asks that the orders of the probate court discharging the guardian and cancelling the bond of McKay be decreed to be null and void; that the order authorizing the compromise of the so-called Buffin contract be set aside; and that the defendants be required to account for the losses sustained by the estate by reason of the illegal investments by the guardian and his surety.

The record shows that, at the time of the death of decedent, the defendant John J. Smolenski was public administrator in and for the county of Kent, and that on October 20, 1930, the Lithuanian consul at Chicago wrote him the following letter:

"This consulate is in receipt of a communication from the parents and brother, residing in Lithuania, of the above-named decedent, wherein they ask this office to see that their interests are properly protected. They inform me that a certified table of kinship is being prepared and forwarded in the near future. Upon its receipt, I will have same translated and sent to you.

"Kindly inform me if it will be necessary for this consulate, as attorney in fact for the foreign heirs, to retain counsel in Grand Rapids. If there is no unusual phase or claim connected with the estate, it

seems to me that this item of attorney's fees could be avoided if we co-operated. Kindly inform me of your opinion in this matter.''

On October 22, 1930, Mr. Smolenski wrote, in answer thereto, the following:

''In answer to your letter of October 20th, pertaining to my appointment as administrator in the above-entitled estate, the same is set for hearing for November 7th, next.

''There are no circumstances at present that need the attention of any attorney in your behalf at this time. Should any occasion arise you will be promptly notified by this office.

''The estate consists of mainly in several pieces of real estate, that the deceased sold by land contract, payments on which contracts are made monthly.

''The only known claim to date is a $500, or thereabouts, funeral bill, which was arranged by the brother of the deceased, to which I as administrator have no objection.

''A copy of the inventory will be sent your office shortly after November 7th, after my appointment and any and all further reports will be promptly sent to your office.''

It is the claim of the plaintiffs that the statement in Mr. Smolenski's letter that the estate consisted mainly of real estate sold by decedent on land contract was false and misleading, and that this false and misleading statement so made by him was never corrected.

On September 30, 1931, administrator Smolenski wrote the consul the following letter:

''The brother of the above-deceased was in to see me the other day and informed me of the same facts as set forth in your letter of September 28th.

''Relative to the sale of the three land contracts, being collected upon by me, I would say that there is no market for the sale of these.

"We are fortunate in that all of these contracts are being paid upon, one of them not in full amount but sufficient to show that moral responsibility is behind the payment.

"Under the circumstances, I would be willing from time to time to send to your office such moneys as may be necessary for the parents in the old country and I so informed the brother when here.

"I will be pleased to. co-operate in every way possible with your office."

On May 1, 1936, the administrator filed his final account, indicating a balance in his hands of $2,556.29 and showing disbursements of $2,633.22, which account has not as yet been allowed by the probate court. If this is a proper account and is allowed by the probate court, it will result in a loss of nearly $9,000 to the estate through illegal investments by Kurant and McKay.

Numerous questions are involved, one of which is whether or not a decree entered in the United States district court for the western district of Michigan is *res judicata* of this proceeding. Defendants contend that it is. Plaintiffs contend to the contrary. We will first concern ourselves with this phase of the case.

It appears that prior to the commencement of the instant suit, plaintiffs filed a bill of complaint in the Federal court aforesaid against defendants Kurant, McKay and Smolenski, alleging conspiracy between defendant Smolenski, administrator, with the other two defendants, to prevent losses that had been sustained by the estate through illegal investments from being recovered. To make clear the names of the parties, their status, and the issues that were before the Federal court for determination, we quote in full the findings and conclusions of Judge Raymond:

"1. Plaintiffs are the parents and heirs at law of Joseph Svitojus, deceased. By bill of complaint they seek an accounting and a money decree against defendants Joseph Kurant (guardian of the estate of Joseph Svitojus, mentally incompetent, from February 7, 1925, to the date of his death in 1930), Frank D. McKay (the surety upon Kurant's guardianship bond), and John J. Smolenski (administrator of the estate of Joseph Svitojus, deceased).

"2. Plaintiffs are residents and citizens of the Republic of Lithuania, and defendants are residents of the western district of Michigan.

"3. Motions by defendants prior to answer to dismiss the bill of complaint for want of jurisdiction were denied with reservation to them of the right of renewal after hearing upon the merits. The motions were renewed by defendants at the conclusion of the hearing, the principal ground for the motions. being that the proceedings for the administration of the estate are still pending in the probate court for the county of Kent and that that court has sole jurisdiction of the subject matter.

"4. Recognizing the general rule that the Federal courts will not interfere with the jurisdiction of probate courts in the settlement of accounts of executors or administrators, plaintiffs charged defendants with fraud and conspiracy, the gist of these charges appearing from the following allegations:

" '9. Plaintiffs charge the truth to be that defendant Joseph Kurant was a mere figurehead or dummy guardian, and that defendant Frank D. McKay actually handled and invested all of the money of said Joseph Svitojus, and made, or caused to be made, all inventories, accounts and reports for said Kurant as guardian and actually did all of the business of said guardianship, and that said Kurant trusted said McKay and implicitly relied upon him and upon said McKay's clerks, servants, agents and advisers in connection with all guardianship matters. Plaintiffs further aver and charge the truth to be

that said McKay procured the appointment of said Kurant and helped said Kurant to qualify as guardian, by becoming his sole bondsman, to the end and for the purpose of controlling and using the funds of said guardianship in divers and sundry speculative real estate transactions then and thereafter handled by said defendant Frank D. McKay.

" '10. Plaintiffs charge the truth to be that all of said investments and transactions were improper, unsound, and unlawful as investments of funds of an incompetent person, and none of said transactions were ever submitted to or authorized by any court, and were made in fraud of the rights of Joseph Svitojus, his estate and his heirs, and were illegally made solely in the personal interest of and for the personal gain, profit, and advantage of said defendants Kurant and McKay, and against and in defiance of the just and lawful rights of said incompetent person, the said Joseph Svitojus, his estate and his lawful heirs.  *  *  *

" '14. Plaintiffs aver and charge the truth to be that thereafter and on, to-wit, January 20, 1931, the said Smolenski, combining, confederating and conspiring with the said Kurant and said McKay to make it appear to the Kent county probate court that the balance reported to be on hand by the final account prepared and filed by said McKay and signed and sworn to by said Kurant in the matter of Joseph Svitojus, mentally incompetent, was in cash or its equivalent, drafted, executed and delivered to said Kurant and to said McKay and his representatives for filing in said court and cause, a paper writing, purporting to be a final voucher  *  *  *  And the effect, intent and purpose of said voucher was to mislead and deceive the probate court of Kent county as to the true condition of said estate and as to the nature of the investments for which the cash of said mentally incompetent had been appropriated.

" '17. Plaintiffs aver that said administrator, defendant John J. Smolenski, has entirely failed, re-

fused and neglected, throughout his administration of the estate of said deceased, to attempt to recover from said guardian, Kurant, or his said bondsman, the said defendant McKay, any of said losses, and plaintiffs aver that said Smolenski has conspired with said other defendants to prevent said losses from being recovered.

" '18. Plaintiffs aver and charge the truth to be that by reason of the aforesaid facts and by reason of the actions and doings and failures to act of said defendants and each of them, and particularly by reason of the improvident, unsound, wasteful and unlawful investments of the funds of said Joseph Svitojus, mentally incompetent, as aforesaid, the funds of said estate have been unlawfully dissipated and wrongfully and fraudulently converted to the use, benefit and advantage of defendant Frank D. McKay and his privies.'

"5. Plaintiffs have failed to establish by a fair preponderance of the evidence the charges of fraud and conspiracy enumerated in the last preceding paragraph of these findings, and with these issues eliminated no jurisdiction remains in this court to determine issues relative to lack of prudence in making investments or to the settlement of the accounts of the guardian or administrator, or as to the liability of the surety upon the bond of the guardian.

"6. The sole jurisdiction over these remaining issues is vested in the probate court for the county of Kent.

"Conclusions of Law

"1. The bill of complaint must be dismissed for want of jurisdiction, but without prejudice to further proceedings upon similar issues in the probate court for the county of Kent. An order will be entered accordingly.

"FRED M. RAYMOND,
"United States District Judge.
"Dated November 24, 1937.
"Order of dismissal entered 11-24-37."

Conspiracy is a species of fraud, so it may be said that fraud is charged on the part of all of said defendants by conspiring together to prevent the recovery by plaintiffs of that part of their decedent's estate lost to it through the illegal investments of defendants Kurant and McKay. From the foregoing quotation, it conclusively appears that the issues in the Federal court case and the instant one are not similar.

Motions were made by the defendants in the Federal court to dismiss plaintiffs' bill of complaint prior to answers, which motions were denied by the Federal judge with leave reserved to defendants to renew said motions after a hearing of said cause on the merits.

At the conclusion of said hearing, Judge Raymond rendered a written opinion relative to these motions to dismiss, filed prior to answers, saying:

"Upon consideration of the motions to dismiss filed prior to answers it appeared that if the allegations of fraud and conspiracy were sustained by proof, this court's jurisdiction should be upheld upon the authority of *Payne* v. *Hook,* 74 U. S. 425, and other similar cases (see Simkins, Federal Practice (Rev. Ed.), p. 514). For that reason the motions were denied with leave reserved to defendants to renew after hearing upon the merits. The court now having heard the proofs and having reached the conclusion that the motions of defendants for dismissal of the bill of complaint for want of jurisdiction, which were renewed at the conclusion of the proofs, must be granted, discussion of many of the issues involved becomes unnecessary."

The court further stated in his opinion:

"Plaintiffs have failed to establish by a fair preponderance of the evidence the charges of fraud and conspiracy enumerated in the last preceding para-

graph of these findings, and with these issues elimi-
nated no jurisdiction remains in this court to
determine issues relative to lack of prudence in mak-
ing investments or to the settlement of the accounts
of the guardian or administrator, or as to the liability
of the surety upon the bond of the guardian.

"The sole jurisdiction over these remaining issues
is vested in the probate court for the county of Kent.

"The substance of the allegations of fraud and
conspiracy are quoted in the findings of fact and
conclusions of law which accompany this opinion.
Having in mind the long-established rule that testi-
mony to sustain charges of fraud or conspiracy must
be clear, unequivocal and convincing and that relief
cannot be afforded upon a fair preponderance of the
evidence which leaves the issue in doubt  *  *  *
the court, after a careful review of the record, is of
the opinion that these charges have not been suffi-
ciently sustained to warrant the relief prayed.  This
finding compels dismissal of the bill of complaint for
want of jurisdiction.''

As a matter of law, the Federal judge concluded:

"The bill of complaint must be dismissed for want
of jurisdiction, but without prejudice to further pro-
ceedings upon similar issues in the probate court for
the county of Kent.  An order will be entered ac-
cordingly.''

The testimony taken upon the Federal court
hearing negatived plaintiffs' allegations of fraud
and conspiracy between defendants Kurant and Mc-
Kay on the one hand and administrator Smolenski
on the other.  Therefore, it must be said that the
conclusion of the Federal judge that the bill of com-
plaint must be dismissed for want of jurisdiction is
in entire harmony with his findings and conclusions
"that the motions of defendants for dismissal of the
bill of complaint for want of jurisdiction which were
renewed at the conclusion of the proofs must be

granted, discussion of many of the issues involved becomes unnecessary,'' and is not inconsistent with his findings that ''plaintiffs have failed to establish by a fair preponderance of the evidence the charges of fraud and conspiracy enumerated in the last preceding paragraph of these findings, and with these issues eliminated no jurisdiction remains in this court to determine issues relative to lack of prudence in making investments or to the settlement of the acts of the guardian or administrator or as to the liability of the surety upon the bond of the guardian.''

Based upon this conclusion of law, an order for dismissal of plaintiffs' bill of complaint for want of jurisdiction was entered in the district court for the United States for the western district of Michigan on November 24, 1937. When the present suit came on for hearing before the circuit court for the county of Kent, the evidence presented consisted of a transcript of the testimony taken in the Federal court and some additional exhibits. The trial court concluded that the order of the Federal court was *res judicata* of the case at bar, and entered a decree dismissing plaintiffs' bill of complaint, without prejudice to further proceedings in the probate court for Kent county. His opinion states,

''I have scanned the pleadings carefully to ascertain if any discrepancy or real difference exists in the allegations contained in the Federal court bill and the amended bill herein filed. I find no substantial difference except that the prayer in this bill seeks to include a nullification of the probate order of September 11, 1935, authorizing the compromise of the Buffin indebtedness.''

The record in this case does not contain a copy of the Federal court pleadings, but the foregoing excerpt from the opinion of the trial judge does not find support in the record that the pleadings in the

two cases were the same excepting "that the prayer in this bill seeks to include a nullification of the probate order of September 11, 1935, authorizing the compromise of the Buffin indebtedness," being an order made in the matter of the estate of decedent by Probate Judge Dalton. The status of the plaintiffs was not the same there as here as will be hereinafter demonstrated.

The original bill of complaint was filed in the Kent circuit court on May 27, 1938. On June 20, 1938, defendants Kurant and McKay filed the following motion to dismiss the bill.

"Now comes the defendants Joseph Kurant, guardian of the estate of Joseph Svitojus, mentally incompetent, and Frank D. McKay by their attorneys McDonald & McDonald and Knappen, Uhl, Bryant & Snow appearing specially for the purpose of this motion only, who jointly and severally move the court to dismiss the bill of complaint filed in this cause for the following grounds appearing on the face of the bill.

"1. That the court has not jurisdiction of the persons of the defendants, or of the subject matter of the suit, for the reason that proceedings for the administration of the estate of Joseph Svitojus, deceased, are pending in the probate court for the county of Kent; that the probate court has sole jurisdiction of the subject matter and affords the plaintiffs an adequate remedy for the grievances complained of.

"2. That the plaintiffs have not legal capacity to maintain this suit, for the reason that John J. Smolenski was the duly appointed and still is acting administrator of the estate of Joseph Svitojus, deceased, and is the sole legal representative of said estate and alone is entitled to bring any action or actions on behalf of said estate or any persons interested therein, including the plaintiffs in this cause.

"3. That the bill of complaint sets forth no inter-

est in the plaintiffs, other than as heirs at law or distributees in the estate of Joseph Svitojus, deceased, and excepting as and when the estate is closed, all debts and administration expenses paid and an order of distribution is made by the said probate court for the county of Kent.

"4. That the defendants and each of them are accountable, if at all, only to the administrator, John J. Smolenski, who has not been requested and has not refused to bring any action against them.

"5. That there is another action pending between the same parties in which they seek the same relief as prayed for in their bill of complaint in this cause, which more particularly appears by the allegations in paragraph 14 of the bill of complaint, wherein the plaintiffs say that John J. Smolenski, the administrator, has filed his final account and 'that plaintiffs have objected to the allowance of said account and are seeking to recover the losses sustained by their decedent Joseph Svitojus and by his estate by reason of the unlawful and improper investments of his funds by defendants McKay and Kurant and by reason of the failure and refusal of said John J. Smolenski, seasonably to require an accounting by said Kurant and by said McKay.'

"6. That the cause of action is barred by a prior judgment of the probate court for the county of Kent in which after notice by publication and a full hearing the said probate court entered an order allowing the final account of Joseph Kurant, guardian, discharged him from all liabilities concerning his trust as guardian and cancelled his official bond on which defendant, Frank D. McKay, was surety.

"7. That the plaintiffs have an adequate remedy in pending probate court proceedings for the administration of the estate of Joseph Svitojus; and that the facts alleged in the bill of complaint are not sufficient to constitute actionable fraud that would justify this court in assuming jurisdiction in this cause.

"8. That the plaintiffs have not used due diligence in asserting their claims and rights alleged in the bill of complaint and are therefore guilty of laches.

"9. That the bill of complaint does not state a cause of action against defendants.

"10. That the said administrator John J. Smolenski is not made a party in the bill of complaint, though he is charged with fraud and is an indispensable party.

"11. That under the statute the said probate judge, John Dalton, was not disqualified to hear and determine the final account of Joseph Kurant, guardian, and to discharge him and cancel his official bond, because of any existing relationship between him and defendant Frank D. McKay.

"Grounds not appearing on the face of the bill.

"Under the circuit court rule No. 18 (1933) the defendants urge, as a further reason for the dismissal of the bill of complaint, the following not appearing on the face of the bill, but supported by the affidavit of John S. McDonald hereto attached.

"1. That the cause of action herein is barred by the prior judgment of the district court of the United States for the western district of Michigan, southern division, in a cause between the same parties, wherein the plaintiffs filed a bill of complaint asking for the same relief as they ask in this cause and alleging the same facts, which they claim constitute actionable fraud on the part of Joseph Kurant and Frank D. McKay; that the cause being at issue, the judge, Hon. Fred M. Raymond, heard it on its merits and made findings of facts in which he found that the fraudulent acts alleged in the bill of complaint had not been sustained by a preponderance of the evidence and thereupon entered an order dismissing the bill for lack of jurisdiction which finding of fact and order or judgment are conclusive and binding on the plaintiffs.

"For the reasons above stated the bill of complaint should be dismissed."

On the 12th day of August, 1938, the Honorable Clark E. Higbee, one of the probate judges in and for the county of Kent, entered the following order in the matter of the estate of the decedent:

"In this cause, Juozas Svitojus and Zuzana Svitojus, as sole heirs at law of said deceased, having filed two certain petitions herein, one on the 17th day of May, 1938, and the other on the 9th day of July, 1938, praying, among other things, that the final account of John J. Smolenski, administrator of said estate, be surcharged with certain alleged losses; that a successor administrator be appointed to take all necessary steps to recover said alleged losses from said Smolenski or from Joseph Kurant or Frank D. McKay, or all or any of them; for an order turning over to said heirs or to their legal representative, Fred P. Geib, the funds remaining in said estate after payment of all just and lawful debts and expenses; and for general relief; and both of said petitions having this day been duly brought on to be heard, petitioners appearing by Fred P. Geib, their attorney; and John Smolenski appearing in his own proper person and by John M. Dunham, his counsel; and Joseph Kurant and Frank D. McKay appearing by Honorable John S. McDonald, their attorney, and the court having heard the allegations of the parties and the argument of counsel, and being fully advised in the premises, finds:

"1. That there is now pending in the circuit court for the county of Kent, in chancery, a suit brought by petitioners herein against said Joseph Kurant and Frank D. McKay, as guardian and surety, for losses resulting from alleged unlawful investments of the funds of said Joseph Svitojus, insane, and that the question of surcharging the final accounts of said Smolenski, administrator, may be materially affected by the outcome of said litigation.

"2. That this court has no lawful power or jurisdiction upon the record as it now stands, to require

an accounting from said Joseph Kurant as guardian of Joseph Svitojus, insane, nor from his surety, said Frank D. McKay.

"3. That the estate of Joseph Svitojus, deceased, has been fully administered and is ready for distribution, except for the determination of the alleged liability of said Smolenski, Kurant and McKay, and the determination of the question of certain fees and expenses claimed by counsel for the administrator and by counsel for said petitioners.

"4. That an adverse relationship exists between said petitioners as heirs on the one hand, and said Smolenski, administrator, on the other hand, by reason of the claims being asserted by and in behalf of said petitioners against said Smolenski, Kurant and McKay, which makes it difficult for said Smolenski as administrator to represent the interests of said heirs and at the same time protect himself.

"5. That petitioners are the sole heirs at law of said deceased and are the lawful owners of all assets of said estate, subject to the payment of such claims for legal services and administration expenses, if any, as may be allowed by any court of competent jurisdiction.

"6. That sufficient estate funds are in the hands of John J. Smolenski, administrator, to satisfy all unsatisfied claims:

"And upon such findings,

"It is hereby ordered:

"1. That the question of surcharging the account of John J. Smolenski, administrator, be, and the same hereby is, postponed and adjourned until after the chancery case pending in the Kent county circuit court, in chancery, wherein petitioners are plaintiffs and Joseph Kurant and Frank D. McKay are defendants, shall be finally determined.

"2. That all claims, demands and rights of action of every kind or character belonging to the estate of said Joseph Svitojus, deceased, against Joseph Kurant, guardian of Joseph Svitojus, insane, and

against Frank D. McKay, individually and as surety of said Joseph Kurant, and against John J. Smolenski, administrator, be, and they hereby are assigned to Juozas Svitojus and Zuzana Svitojus, as sole heirs of said deceased, subject, however, to any and all lawful liens for legal services rendered or to be rendered in their behalf.

"3. That the funds of said deceased now remaining in the hands of said John J. Smolenski, Administrator, continue to be held by him, subject to the order or orders of any court of competent jurisdiction and disbursed by him in accordance with such order or orders.

"4. All other matters involved in said petition are hereby postponed until action shall be taken upon the final account of said John J. Smolenski, administrator, as aforesaid, after termination of said circuit court litigation."

On August 16, 1938, plaintiffs filed their amended bill of complaint making administrator Smolenski a party defendant. By reference to said amended bill of complaint, it conclusively appears that neither the original bill of complaint nor the Federal court bill had or could have had included therein the following allegation:

"Plaintiffs further aver that since the filing of the original bill of complaint herein, the probate court for the county of Kent has made and entered an order in the matter of the estate of Joseph Svitojus, deceased, wherein and whereby all claims and rights of action of every character held by said estate have been assigned to plaintiffs herein, the said Joseph Svitojus, and Zuzana Svitojus, and that at the present time the plaintiffs herein are the sole owners and the sole parties entitled to assert said rights and the sole parties entitled to enforce the same in any court. A true copy of said order of the Kent probate court is hereto attached, marked plaintiffs' Exhibit A."

On August 29, 1938, the Honorable William B. Brown, one of the circuit judges in and for the Kent circuit, denied the motion to dismiss plaintiffs' bill of complaint without expressing any opinion "on any question involved in the case."

On September 13, 1938, defendants Kurant and McKay filed their answer to said amended bill of complaint, and on September 20, 1938, defendant Smolenski filed his answer thereto.

No appeal was taken from the order of the Federal court dismissing plaintiffs' bill for want of jurisdiction.

This appeal followed the decree of Judge Moll dismissing the amended bill of complaint in the instant suit.

A final order, judgment or decree of a court of competent jurisdiction, in the absence of fraud or collusion, is binding upon all parties involved, and if not vacated or set aside is conclusive, and such final order, judgment or decree is bound to be respected and treated by every tribunal as such.

We do not consider the reasons given by the Federal judge for the result reached by him as of as much importance as the decree entered. It is undeniable that the final order is, in effect, a decree entered in the district court of the United States for the dismissal of plaintiffs' bill of complaint for want of jurisdiction. In *Heck* v. *Bailey*, 204 Mich. 54, we said:

"Courts do not speak through their opinions but through their judgments and decrees (15 R. C. L. p. 570, § 3), therefore the announcement of the learned circuit judge at the conclusion of the testimony may be disregarded."

Here, an order dismissing plaintiffs' bill of complaint "for want of jurisdiction" was entered by the

United States district court. This order entered as aforesaid has never been vacated or set aside.

Such final order or decree of said court is conclusive. The lower court and this court are bound to respect it. The court said in language that is susceptible of but one interpretation, "The bill is dismissed for want of jurisdiction."

The language used by the district judge in the order dismissing plaintiffs' bill of complaint was as expressive, clear, distinct and definite as words could make it.

The appellate court on appeal might have said that the district court was wrong, and that it did have jurisdiction. We cannot say that. Nor did the trial judge have the right to hold that the Federal court was in error and that said court did have jurisdiction, and that his findings were *res judicata* of the instant suit. But even if we were permitted to take into consideration the findings of the Federal court as a basis for the order which appellees insist is *res judicata* of the issues involved here, we must find that the trial court was in error in the interpretation he gave to the findings and conclusions of that court. The district judge said in effect that he did not find conclusive evidence of fraud and conspiracy on the part of the defendants, and that without such proof he was without jurisdiction to set aside the orders and decrees of Probate Judge Dalton, the brother-in-law of defendant Frank D. McKay, entered in the matter of the estate of Joseph Svitojus, an incompetent, and in the matter of his estate as a deceased person; also that said court was without jurisdiction to grant relief against defendants for unwise and improper investments of the incompetent's funds by his guardian and the surety for said guardian. It is thus clear to us from the foregoing, and for reasons that will be later discussed, that the Federal suit was

dismissed by the district judge for want of jurisdiction, and that he did not have jurisdiction to hear and determine said cause on its merits.

"It is a matter of no consequence in this case that the court of common pleas No. 1 in fact had jurisdiction; that court decided otherwise, and refused to exercise its jurisdiction. It is true that an appeal might have been taken, but none was taken, and the decision against the jurisdiction in consequence became the law in that particular case; but as the decision was not upon the merits, and did not determine the plaintiff's title to relief under the bill, it was not, according to all the cases, a bar in another suit.

" 'The doctrine of *res judicata*,' said Mr. Justice Foster in *Foster* v. *The Richard Busteed*, 100 Mass. 409 (1 Am. Rep. 125), 'is plain and intelligible, and amounts simply to this: That a cause of action once finally determined without appeal between the parties, on the merits, by any competent tribunal, cannot afterwards be litigated by new proceedings, either before the same or any other tribunal. But no such effect is attributable to a decree dismissing a bill for want of jurisdiction, failure of prosecution, want of parties, or any other cause not involving the essential merits of the controversy; and where in the answer various matters of defense are set forth, some of which only relate to the maintenance of the suit and others to the merits, and there is a general decree of bill dismissed, from which it does not appear what was the prevailing ground of defense, it is impossible to hold that the decree operates to preclude future proceedings.' In *Walden* v. *Bodley*, 14 Pet. (39 U. S.) 156, it was held that a decree dismissing a bill in chancery generally may be set up in bar of a second bill; but where the bill has been dismissed on the ground that the court had no jurisdiction, which shows that the merits were not heard, the dismissal is not a bar to a second bill. To the same effect, also, is *Hughes* v. *United States,* 4 Wall. (71

U. S.) 232. From the authorities cited, and the reasons assigned therein, it is plain that when a bill is dismissed upon the ground of want of jurisdiction, the dismissal cannot be said to be upon the merits; for whether the action of the court be right or wrong, the complainant's title to the relief sought is not thereby determined." *Weigley* v. *Coffman*, 144 Pa. 489, 497 (22 Atl. 919, 27 Am. St. Rep. 667).

We quote from *Walden* v. *Bodley*, 14 Pet. (39 U. S.) 156, cited in *Weigley* v. *Coffman, supra:*

"As the first bill was dismissed for want of jurisdiction, and the second by the complainants, at rules, in the clerk's office, it is clear that neither can operate as a bar to the present bill. A decree dismissing a bill generally, may be set up in bar of a second bill, having the same object in view; but the court dismissed the first bill on the ground that they had no jurisdiction, which shows that the case was not heard on its merits. And this also appears from the dismissal by the party, of the second bill, in the clerk's office."

In *Hughes* v. *United States,* 4 Wall. (71 U. S.) 232, also cited in *Weigley* v. *Coffman, supra,* we find the following:

"In order that a judgment may constitute a bar to another suit, it must be rendered in a proceeding between the same parties or their privies, and the point of controversy must be the same in both cases, and must be determined on its merits. If the first suit was dismissed for defect of pleadings or parties, or a misconception of the form of proceedings, or the want of jurisdiction, or was disposed of on any ground which did not go to the merits of the action, the judgment rendered will prove no bar to another suit. *Walden* v. *Bodley,* 14 Pet. (39 U. S.) 156; 1 Greenleaf, Evidence (8th Ed.), §§ 529, 530, and authorities cited therein."

See, also, *Slaker* v. *McCormick-Saeltzer Co.*, 179 Cal. 387 (177 Pac. 155).

Upon the question of whether or not the Federal court did have jurisdiction of the parties and the subject matter, and as to whether or not the court with all the pleadings and facts before it could legally determine the cause on its merits, we find that that court could not do otherwise than to dismiss the bill for want of jurisdiction. It was clearly apparent from the bill of complaint there filed that plaintiffs as heirs at law were seeking recovery on a claim in favor of the estate of decedent against the defendants Kurant and McKay for recovery of funds of their decedent illegally invested by the former guardian and his bondsman; that said estate was in process of administration; that John J. Smolenski was the administrator, and, in the absence of special and exceptional circumstances, the only person entitled to the possession of the assets of the estate or who could seek recovery thereof; that no order of assignment or distribution of the whole or any portion of said estate had been made to plaintiffs, and that no one, except in case of fraud or collusion to which the administrator was a party, other than the administrator, could take any proceedings for an accounting or recovery on any claim in favor of the estate against defendants Kurant and McKay. Prior to the order of assignment made by Judge Higbee on August 12, 1938, these plaintiffs had no legal right to assert or attempt to enforce a claim against Kurant and McKay. Before this order was made, which is hereinbefore set forth, without proof of fraud or collusion to which the administrator was a party, these plaintiffs had no status in any court, either Federal or State. The right to institute suit and to recover rested solely with the administrator. In *Morris* v. *Vyse*, 154 Mich. 253 (129 Am. St. Rep. 472), we said:

"Until settlement and distribution of an intestate estate, the personal property would rightly be in the custody of the administrator. See *Cullen* v. *O'Hara*, 4 Mich. 132; *Hollowell* v. *Cole*, 25 Mich. 345; *Albright* v. *Cobb*, 30 Mich. 355; *Parks* v. *Norris*, 101 Mich. 71. At the time of the death of Mr. Fish, under these authorities, the only person who could have brought an action for the recovery of this money was the administrator. It was not only his right, but it was his duty, to institute an action to obtain it."

In 11 R. C. L. p. 260, § 295, the rule regarding the rights of heirs and executors is stated as follows:

"The general rule is that executors and administrators alone can bring actions to recover assets belonging to a decedent's estate or to obtain damages for the conversion of the personal property of the estate. When there is an executor or administrator neither the heirs nor the next of kin of a decedent have any standing to maintain an action for the recovery of such property. The beneficiaries will not even be allowed to appear and defend an action against administrators who refuse to make a proper defense by pleading the statute of limitations. Nor, generally, has a legatee any better standing than the next of kin with regard to suits concerning the estate, and the same may be said of creditors of the estate. For example, a suit to recover a legacy must be brought by the personal representative of the deceased legatee and not by his next of kin. Even the sole distributee cannot, as a general rule, before a decree of distribution, maintain an action at law or a suit in equity in respect to the personal estate of his ancestor. A distributee cannot maintain an action to recover possession of personalty belonging to his ancestor, nor can he sue for the conversion of such property, nor maintain an action for breach of a contract made with his ancestor. However, it has been held in some jurisdictions that one who takes the entire estate under a will may, with the assent of the

executor, bring suit to recover in his own name a
chose in action; and, also, that where there are no
debts or claims of any kind against the estate, and
nothing for an administrator to do, if one should be
appointed, except to distribute the personal estate
to those entitled to it by law, the heirs may maintain
necessary actions for the purpose of reducing the
property to possession in order that it may be dis-
tributed.''

In 11 R. C. L. p. 262, § 297, we find:

''While an heir cannot, as a general rule, maintain
an action to recover the assets or collect the debts due
the estate, still, if there are special circumstances,
such as fraud, collusion, insolvency or unwillingness
to act on the part of the personal representative, the
heir may bring the action in his own name.   The
most important of these exceptional circumstances
in which others than the executor or administrator
are permitted to sue arises where the personal repre-
sentative of the deceased, by reason of collusion with
the defendant, is derelict in the performance of his
duty, as where it is shown that there is collusion be-
tween the surviving partner and the executor, the
latter refusing to compel an accounting by the
former, or where there have been such dealings be-
tween the two as render it probable that the executor
will not make a *bona fide* effort to secure an account-
ing.''

It is readily discernible that the exceptional or
special circumstances which permit an heir or leg-
atee to maintain a suit for recovery of assets of an es-
tate, or for debts due to it, were not present in the Fed-
eral court case, nor were they present in the plead-
ings in the instant case until after the amendment of
plaintiffs' bill of complaint as hereinbefore referred
to.   The record discloses that neither before the insti-
tution of the suit in the Federal court, nor before the
institution of the instant proceeding, had the admin-

istrator declined to bring suit against Kurant and McKay for the recovery of losses sustained by reason of these illegal investments, so it can readily be seen that the Federal court did not determine the liability of Kurant and McKay to the estate of the decedent in the Federal court proceeding. In effect, Judge Raymond found a lack of evidence establishing conspiracy between the administrator and the other defendants and without such evidence that court had no jurisdiction to determine issues relative to lack of prudence on the part of Kurant and McKay in making the investments complained of and in holding that no relief could be afforded to the plaintiffs without proof of their charges of fraud and conspiracy, to which the administrator was a party, charged in the bill of complaint. Judge Raymond did not hold that the investments made were legal, but did state: ''There is little question that heavy and unnecessary losses were sustained by the estate as the result of improper investments in incumbered real estate, which incumbrances the guardian assumed and agreed to pay.''

The subject matter of the Federal court case and the instant one is not similar. The record before the Federal court clearly disclosed that it was without jurisdiction. Prior to the order of Judge Higbee, the administrator had a cause of action against the guardian and his bondsman. After the order of assignment, plaintiffs clearly have the same right as originally the administrator had to institute this suit and obtain an accounting if the investments made by the guardian and his bondsman were illegal. In the Federal court case, the plaintiffs were suing as heirs at law on the theory of a conspiracy between the administrator, the guardian and his bondsman. In the instant case, the plaintiffs are suing as assignees and distributees of the estate of the decedent

by virtue of an order of the probate court of Kent county. It is apparent that the status of the plaintiffs in the Federal court case and their status in the present case is entirely different. The determination by Judge Raymond in the Federal court is not *res judicata* of this proceeding.

This court in *Creek* v. *Laski*, 248 Mich. 425 (65 A. L. R. 1113), said:

"A judgment is not *res judicata* unless the identical matter in issue in the subsequent proceeding was determined by the former adjudication. *Murphy Chair Co.* v. *American Radiator Co.*, 172 Mich. 14."

In the same case, the following from 34 C. J. p. 813 was quoted with approval:

"The same transaction or state of facts may give rise to distinct or successive causes of action, and a judgment upon one will not bar a suit upon another. Therefore a judgment in a former suit, although between the same parties and relating to the same subject matter, is not a bar to a subsequent action, when the cause of action is not the same."

In the Federal court case and also in the instant one, before plaintiffs amended their bill of complaint, the defendants contended, and correctly so, that, in the absence of proof of fraud to which the administrator was a party, the plaintiffs, as heirs at law, had no authority to institute or maintain an action against defendants Kurant and McKay for recovery of funds of the deceased incompetent illegally invested by them.

In the absence of fraud to which the administrator was a party or other special circumstances which are not present here, said administrator was the only party who could lawfully maintain an action for recovery of funds of the estate unlawfully invested by Kurant and McKay. The Federal court, therefore,

had no alternative other than the dismissal of the case for want of jurisdiction. An appeal from this order or decree by plaintiffs would have availed them nothing. No order or decree of distribution or assignment had then been made by the probate court having jurisdiction of this estate. The sole legal representative was John J. Smolenski, the administrator.

If, after determination by the Federal court that it was without jurisdiction to grant plaintiffs relief, the administrator had brought the present suit for recovery by the estate of the funds of the incompetent illegally invested by the guardian and his surety, could they, the guardian and surety, successfully contend that such determination, and the decree entered thereon, was *res judicata* of such action by the sole legal representative of the estate? If so, then the decree of the trial court should be affirmed. If not, then it must be reversed.

The plaintiffs, by virtue of the order and decree of Judge Higbee made and entered on the 12th day of August, 1938, now stand in the shoes of the administrator, clothed with all the authority and rights which he had prior to the entry of said order. The order formed the basis for the amendment to plaintiffs' bill of complaint and is set forth in full in the amended bill of complaint.

To hold that the legal representative or representatives of the Svitojus estate are not entitled to maintain this suit because of the determination by the Federal court that the heirs at law of decedent, in the absence of a showing by convincing proof of fraud to which the administrator was a party, could not maintain an action in that court because of lack of jurisdiction is, we believe, doing violence to every principle of equity, good conscience and legal jurisprudence, and is in direct contravention of the legal

rules and principles heretofore enunciated by the courts of this and other jurisdictions.

In the instant case we have different parties, that is, the status of plaintiffs is not the same, and a different issue because the alleged wrongs of the administrator are not here involved.

The bill of complaint in the Federal court was dismissed for want of jurisdiction "but without prejudice to further proceedings upon similar issues in the probate court of Kent county, Michigan."

After the dismissal of this bill without prejudice to further proceedings in the probate court, the plaintiffs filed their petition in the probate court for the county of Kent and obtained from a qualified judge of probate of said county the order hereinbefore quoted, assigning to them "all claims, demands and rights of action of every kind or character belonging to the estate of said Juozas Svitojus, deceased, against Joseph Kurant, guardian, of Juozas Svitojus, insane, and against Frank D. McKay, individually and as surety of said Joseph Kurant and against John J. Smolenski, administrator."

Defendants Kurant and McKay contend that the filing of the first annual account of guardian Kurant and its approval by Judge Higbee, one of the probate judges of the county of Kent, on the 26th day of April, 1926, showing that the incompetent's money was invested in land contracts, notice of hearing on this account having been published according to the requirements of the statute, is conclusive upon these plaintiffs as to the propriety of the investments and that it is *res judicata* of the instant proceeding.

We appreciate that this court has stated in *Nowland* v. *Rice's Estate*, 138 Mich. 146:

"The order of the probate court allowing the first account being unappealed from is conclusive upon appellant. If he desired to dispute any of the find-

ings of the court upon the items of that account he should then have appealed. He cannot reopen it 12 years after it has been adjudicated upon the assumption that it was erroneous. Parties interested in the estate had a right to assume that the account as allowed was correct and to rely upon the order of the court as final.''

This rule, however, is not held to apply where it is later discovered that in such an accounting the administrator or guardian has concealed from the court material facts. We said in *Re Horn's Estate,* 285 Mich. 145, 152, after quoting as above:

''However, where there is fraud, or breach of trust, or concealment of assets, or failure to give proper notice of the hearing, an allowance of an annual account is not *res judicata. MacKenzie* v. *Union Guardian Trust Co.,* 262 Mich. 563; *Baxter* v. *Union Industrial Trust & Savings Bank,* 273 Mich. 642; *Porter* v. *Long,* 124 Mich. 584.''

In the first annual account of the guardian, he showed cash receipts of $14,056.85. He showed disbursements of $647.05, on hand $13,409.80, thus accounting for all receipts. This accounting further showed ''money invested in land contracts $13,204.88, money in savings account $204.92. Nowhere in the accounting did he disclose that these land contracts in which he had invested the incompetent's money were subject to mortgages nearly equal to the amount of the investments, nor subject to any mortgage or mortgages, which he, as guardian, had assumed for his ward and agreed to pay. We must hold that this concealment by the guardian of the fact that he had made these investments in these securities subject to mortgages nearly equal to the amount of the investment, whether made with the intent to deceive the court or not, was such a concealment of material and important matters as to justify us in

saying that Judge Higbee certainly would have made no order allowing said account had all of the facts been disclosed in this acounting. This order of the probate court, made under these circumstances, *is certainly no bar to this proceeding.*

The final account of the guardian was filed in the Kent probate court on October 1, 1930, and showed receipts as follows:

| | | |
|---|---|---|
| On hand January 1, 1930 | | $14,264.53 |
| Interest received from money invested in land contracts | | 406.57 |
| Bank interest | | 9.97 |
| | Total | 14,681.07 |
| Disbursements | | 942.26 |
| On hand October 1, 1930 | | $13,738.81 |

This account was allowed on November 1, 1930, by Probate Judge Dalton, brother-in-law of defendant McKay, and on the 20th day of January, 1931, a receipt (hereinbefore set forth in full) from the administrator to the guardian acknowledging receipt of the said sum of $13,738.81 was given, and later, on January 27, 1931, an order was made by the same Judge Dalton, discharging Kurant as guardian and cancelling his bond. On January 22, 1931, Smolenski, as administrator, filed an inventory in the probate court for Kent county, disclosing for the first time that the estate of the decedent consisted of certain land contracts, subject to mortgages as heretofore mentioned. Even this account did not show from whom the contracts were purchased by the guardian.

Counsel for defendants Kurant and McKay contend:

"The order allowing the account was not appealed from and we submit that it was *res judicata* on the propriety of the investments. Their propriety could

not thereafter be questioned. So it is immaterial that the final account did not state the character of the investments. At least having fully disclosed all of the investments and their character in the first annual account it cannot be said that there was fraudulent concealment in the guardian's failure to describe them in his final account.

"Moreover, Judge Raymond of the United States district court in a case between the same parties in which fraud, conspiracy and collusion were charged against these same defendants after a hearing on the merits decreed that the plaintiffs had failed to establish any of the charges. We submit that the decree of the United States district court is *res judicata* on the question of fraud, conspiracy and collusion.

"However, we do not regard Judge Raymond's decree as of much importance because no fraud is charged in the pleadings in the instant case. There being no charge of fraud here the only question before the court if an accounting is ordered is the propriety of the guardian's investments and that question was conclusively settled in the allowance of the first annual account."

It is clear from this contention of counsel for defendants Kurant and McKay that they do not consider the decree of Judge Raymond as of much importance in the determination of this case, but that this proceeding is one for an accounting, and that if an accounting is ordered then it would be for this court to determine the propriety of the guardian's investments but for the fact that that question was conclusively settled in the allowance of the guardian's first annual account.

Where trust funds are involved, as in this case, equity has jurisdiction where the relief sought is for an accounting or to determine the propriety of investments by a trustee. It is not necessary to allege or prove fraud in such instances.

A diligent search of the record absolutely fails to show that either the first or any other annual account or the final account of the guardian disclosed the character of these investments. No mention is made in any of the guardianship proceedings in the probate court of any of these investments (if they can be dignified by that name), showing incumbrances of upwards of $12,000, or of any amount. So far as disclosed by the record, the character of these investments first appears in the inventory filed by administrator Smolenski, January 22, 1931. This was in the estate, not in the guardianship files. This showed assets, consisting almost entirely of land contracts in the amount of $18,068.04, subject to two mortgages amounting to $4,319.23. It will thus be seen that nowhere in the guardianship files was there any disclosure of any incumbrances whatsoever against the real estate described in the land contracts.

Defendant McKay's version of the transactions which resulted in these investments is as follows:

"The first time I heard of Joseph Svitojus or the Joseph Svitojus estate was when Mr. Kurant came in to see me about investing the money. However, I did sign guardian bonds, both of them, prior to that; but at neither time did I see Mr. Kurant; I was out all week, and I would usually come in at the week end, and I remember that those bonds, both of them, were on my desk to be signed. I think I took them over, I am not positive, personally to the probate court, but I did not see Mr. Kurant at that time and wouldn't have remembered the name at that time. I was spending most of my time in Lansing at that time in my duties as State treasurer. I don't remember what time it was that Mr. Kurant came in and spoke about making investments.

"There was no conversation about where he got the money, he told me at that time that somebody was

in the asylum and he was guardian of the estate and that he wanted me to invest the money for him. *  *  *  I then told him how I had been building some of these homes, I think he was familiar with my building because I built all around his house, the whole block, built it practically solid. I had known Mr. Kurant for many years, probably 35 or nearly 40 years. So I explained about these contracts, told him his neighbor Mrs. Walker had been buying them and had invested her money in them. I said, 'I will be too glad to put them into these contracts; I consider them all good.' He asked me if they were good, I said yes. *  *  *

"When the papers were prepared, our office prepared them, I called him to come down, and if I remember correctly, he was painting a house, or he was doing something, he wanted to know if I could come up, so Mrs. Hull handed me the papers, and I went up to his house, and we then went over to the bank from there, he got the money, I think we went to the bank—went to two banks, they are a block apart. Anyhow, we got the money, and I offered to turn over the contracts to him. He said, 'I wish you would keep those, you got a safe, keep them for me in a vault; keep them for me, keep them together, because I have no safe.' I took them back to the office and handed them to Mrs. Hull and told him I said, 'all right,' and from then on all matters of collecting, and so forth, the office handled that, and I did not see him for quite some time. At that time I think he told me this man was getting better, and wanted to know if he got better if he could get his money, because, he said, he belongs back in Lithuania and they wanted to send him back. I said, 'if he gets better, when he gets out, we will resell these contracts and give him the money, and see that he gets on his way to Lithuania.''

Mrs. Ivan E. Hull, a witness for the defendants, gave testimony relative to this transaction as follows:

"I have been employed by Mr. McKay as his book-keeper, in charge of his office, about 20 years. I left that position about a month before Mr. Hull went on the utilities commission. That must have been two years, two or two and a half years ago. I was in charge of Mr. McKay's office, the bookkeeping end of it, particularly during the years 1925 and some years prior to that. And from that time and up to two or three years ago I was in complete charge. I first heard of this Svitojus estate and the guardian-ship matter when Mr. Kurant came into the office in 1925, I believe. I think it was in June or July. The first conversation I remember with reference to the Svitojus estate was when Mr. McKay asked me to look up some contracts equivalent to the amount. I was not present at any conference preceding my look-ing up the contracts, between Mr. McKay and Mr. Kurant. I saw Mr. Kurant in there. I knew Mr. Kurant before. He had been in to pay his insurance premiums at my office. I saw Mr. Kurant go to Mr. McKay on this date. Mr. McKay said that Mr. Kurant wanted to invest some money in land con-tracts and asked me to look up some that would be equivalent to the amount of money he wanted to in-vest. I believe Mr. McKay did tell me at that time what the amount was. I don't remember how long this conversation was before the delivery of any land contracts to Mr. Kurant. It may have been a few weeks, but I don't remember exactly. Following that conversation with Mr. McKay, I did pick out from Mr. McKay's land contracts certain contracts. They were the Buffin contract, and the Szekely, Hoekstra and Zelinkas contracts. I did not use any other method or standard than that of getting the aggregate number of contracts that would just about come out even with the money that Mr. Kurant had to invest because all our contracts were good."

It conclusively appears that an estate of nearly $14,000 in cash was invested by the guardian in land contracts owned by his surety, McKay; that each

and every one of said contracts was subject to a mortgage in a substantial amount that had been placed thereon by McKay, which liens the guardian assumed and agreed to pay; and that in some instances the mortgages have been foreclosed and the entire investment lost to the estate. That such investments were not only improper and improvident, but were clearly illegal, is too well established to require either discussion or citation of authorities. This court will take judicial notice of the fact that, at the time these investments were made by defendants Kurant and McKay, this ward's money could have been invested in bonds of the United States, bonds of the State of Michigan or good municipal bonds that would have yielded a fair return and the principal have been kept intact. We do not hold that a guardian of an incompetent person is an insurer of the investments made by him for his ward, but do hold that, "When such a fund passes into the hands of a trustee, it comes impressed with a double duty, *first*, so to invest it that it can be turned over at the expiration of the trust period without loss, and, *second*, to secure an income therefrom. He must act honestly and faithfully and in what he believes to be the best interest of the *cestui que trust*. He must exercise a sound discretion. He is bound to proceed with diligence in investigating the nature of the proposed investment and to use such care in deciding as, in general, prudent men of intelligence and integrity in such matters employ in their own affairs when making a permanent investment in which the primary object is the preservation of the fund and the secondary one that of obtaining an income therefrom. He must not permit himself to take the hazard of an investment with the hope of largely increasing the fund as he might, perhaps, do in the prudent management of his own estate. The entire element of speculation must be removed. He must at all times remember that he is handling a trust fund, the care of which has been

entrusted to him in reliance on his integrity, fidelity and sound business judgment." *In re Buhl's Estate*, 211 Mich. 124, 131 (12 A. L. R. 569). See, also, 12 R. C. L. pp. 1131–1134, §§ 29 and 30; 26 R. C. L. pp. 1307–1310, §§ 161, 162 and 163.

It is apparent from the record in this case that at least $9,000 of the incompetent's estate has been dissipated by reason of improper and illegal investments, all of which reached the coffers of defendant McKay through his sale of these junior securities to the guardian for whom he was surety.

On May 1, 1936, administrator Smolenski filed his final account in the matter of this estate in the probate court for Kent county, which account has not yet been allowed, showing that the total amount received by him during his administration to have reached the amount of $5,209.51, including the sum of $3,057.84 received on the compromise of the Buffin contract, and showing disbursements in the sum of $2,653.22, leaving a balance remaining in the hands of said administrator as of that date of $2,556.29.

During the administration of Mr. Smolenski, mortgages on the property described in two of the land contracts in which the guardian had invested the incompetent's funds were foreclosed and entirely lost to the estate, and the amount of the investment in the Buffin contract, with the exception of approximately $3,000, was a loss. If the decree of the court below is permitted to stand and the account of the administrator allowed, the amount of this estate will be further decreased by allowances for legal services to the administrator, which will probably leave considerably less than $3,000 for the heirs of the decedent out of approximately $14,000 in cash that went into the hands of defendant Kurant, as guardian for the incompetent, and his surety, McKay. A court of equity should not put its stamp of approval upon the

mismanagement of trust funds such as is disclosed by the record in this case unless there are compelling reasons for so doing.

Defendant Smolenski in his brief filed in this cause insists that these plaintiffs are barred from any relief because of laches. There is no justification for this contention. From the time of the appointment of a guardian for decedent in 1925 until his death in 1930, decedent was confined in an insane asylum in this State because of an adjudication of incompetency by the probate court of Kent county. His presumptive heirs at law at that time, and heirs at law now, resided in a foreign country. During the period between the adjudication of incompetency and the death of decedent there was no one to make any protest against any of the doings of the guardian and his surety. From 1930, up to and including the present time, the estate has been in the hands of defendant Smolenski, as administrator, who was appointed by reason of being public administrator in and for the county of Kent, and who was charged with the duty of conserving the estate and administering the same in accordance with the laws of this State and the orders of the probate court of the domicile of the decedent. If there has been any laches on the part of any one, it has been that of the administrator, and his laches cannot bind plaintiffs. There is nothing in the record to indicate, and no claim was made by Mr. Smolenski in his testimony, and no contention is made by his counsel in his brief, that he, Smolenski, ever disclosed to the Lithuanian consul or his attorney that the investments in these land contracts were made by the guardian and not by decedent. The first knowledge, so far as the record discloses, of these illegal investments made by the guardian that the consul or his attorney had was when the petition

for authority to compromise the Buffin contract was filed sometime in July, 1935, and the record does not disclose any lack of diligence on the part of plaintiffs after the ascertainment of all of the facts in connection with these investments in proceeding to require an accounting from those responsible for such illegal investments and the resulting loss. Can it be said that the failure of the plaintiffs, who were and are residents of Lithuania, or the Lithuanian consul, to examine the records in the office of the register of deeds of Kent county instead of relying upon the assurance of the public administrator that these investments in land contracts had been made by decedent in his lifetime, constitutes a bar to their right of recovery? Decidedly not. We hold that nothing in the record discloses such lack of diligence on the part of plaintiffs as would subject them to a charge of laches sufficient to bar recovery against those of the defendants the court may find responsible.

There is no merit to the contention of counsel for defendants that if the money of the incompetent had been left on deposit in the banks and continued there during the administration of his estate that such estate would have undoubtedly sustained much greater losses than it did through these improper, improvident and illegal investments. Neither is there merit to the contention that these serious losses were an incident to the general depression. If the funds of the incompetent had been invested, as hereinbefore suggested, in government, State or municipal bonds, no losses at all would have resulted. Furthermore, it was the duty of defendant Smolenski, appointed as administrator upon his own petition, when he discovered the disposition that had been made by Kurant and McKay of the trust funds, to take proceedings to get such funds into his hands as the rep-

resentative of the estate of decedent. Mr. Smolenski was not only administrator of this estate, charged with duties and responsibilities imposed upon him by statute, but was also a public administrator in whom great confidence had been reposed by the appointive authorities, charged with the representation of unknown and foreign heirs. It would be a travesty on justice to hold that his laches, if he has been guilty of laches, is a bar to plaintiffs from obtaining the relief sought.

We think further discussion of the question of laches is entirely beside the issue in view of the conclusion reached by us that the orders made by Judge Dalton in the matter of the estate of the incompetent after defendant McKay became surety on the guardian's bond are absolutely void because of his relationship to McKay. Said orders are held for naught in view of the statutes and numerous decisions of this court. See 3 Comp. Laws 1929, § 13888 (Stat. Ann. § 27.466) ; *Horton* v. *Howard,* 79 Mich. 642 (19 Am. St. Rep. 198) ; *Bliss* v. *Caille Brothers Co.,* 149 Mich. 601 (12 Ann. Cas. 513) ; *Davis Colliery Co.* v. *Charlevoix Sugar Co.,* 155 Mich. 228. See, also, *Crook* v. *Newborg,* 124 Ala. 479 (27 South. 432, 82 Am. St. Rep. 190). There can be no such thing as laches against an absolutely void judgment or order. We further hold that the orders made by Judge Dalton in the matter of the estate of Joseph Svitojus, deceased, are void for the same reason, and that all proceedings taken by defendant Smolenski as administrator of the estate of said decedent, by virtue of any order made by the said probate judge, are also void.

The decree of the trial court dismissing plaintiffs' bill of complaint should be reversed. A decree of this court should be entered in accordance with this opinion and the case remanded to the circuit court

for the county of Kent, in chancery, for a hearing to determine the amount for which defendants Kurant and McKay should be required to account to plaintiffs for losses sustained by the estate by reason of the illegal investments of the funds of the incompetent, the liability of McKay to be limited to the amount of the penalty of his bond. Appellants should recover costs of this court against defendants Kurant and McKay. We should not allow defendant Smolenski to recover costs against appellants.

McALLISTER, J. (*dissenting*).  I concur with Mr. Justice CHANDLER that Judge Raymond's order was not *res judicata* with regard to the present suit. The status of plaintiffs is different. Since the former suit, the probate court has made an order assigning to plaintiffs all rights of action on behalf of the estate. Previously they had been only heirs in an estate in which the administrator was possessed of such rights of action. To raise an estoppel by judgment, it is not only necessary that the party sought to be bound should have been a party to both actions, but he must have appeared in both in the same character or capacity. 34 C. J. p. 997.